

**FILED**
**Apr 26, 2024**
**01:30 PM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**

**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | | |
|---|---|---|
| Jonathan Webb | ) | Docket No. 2023-02-7158 |
| | ) | |
| v. | ) | State File No. 68594-2023 |
| | ) | |
| Gem Care, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Brian K. Addington, Judge | ) | |

---

**Affirmed in Part, Reversed in Part, and Remanded**

---

In this interlocutory appeal, the employee asserts the trial court erred in denying his request for temporary disability and medical benefits. The employee alleged he injured his left knee when he tripped on a floor mat at work. The employer denied the claim, asserting that: (1) the alleged incident was unwitnessed; (2) the employee did not report the alleged accident until after he had been terminated for cause; and (3) the employee had a preexisting history of left knee problems. Following an expedited hearing, the trial court determined the employee had not come forward with sufficient evidence indicating a likelihood of proving the occurrence of a compensable accident at trial, and it denied the claim for both temporary disability and medical benefits. The employee has appealed. Upon careful consideration of the record and arguments of the parties, we affirm in part and reverse in part the trial court's order and remand the case.

Presiding Judge Timothy W. Conner delivered the opinion of the Appeals Board in which Judge Pele I. Godkin and Judge Meredith B. Weaver joined.

Jonathan Webb, Rutledge, Tennessee, employee-appellant, pro se

Allen Callison and Trent Norris, Brentwood, Tennessee, for the employer-appellee, Gem Care, Inc.

## Factual and Procedural Background

Jonathan Webb ("Employee") was an employee of a temporary staffing agency, Gem Care, Inc. ("Employer"), and was assigned to work as an inspector at Matsuo Industries ("Matsuo"), a manufacturing facility. Employee reported that, on August 21,

1

2023, he was carrying boxes near his workstation when he tripped over a floor mat, which he testified was approximately four inches high. He did not fall, but he "went down to one knee" and "felt the front of [his] knee pop." Employee testified that it "felt like fire behind my knee" and that "it swelled up instantly." He explained that he did not report the event immediately because he did not want to lose his job and he thought he could treat his knee with ice that evening. He decided that if his symptoms had not improved by the following morning, he would report the incident to his manager.

Later that day, as he was preparing to clock out, Employee had a confrontation with another worker who had asked him to stay and perform "about two more hours of work." Employee testified he explained to the other worker that such tasks were not part of his job, and he confirmed with his supervisor before leaving for the day that he did not need to stay late. Employer's representative Rhonda Estep then called him as he was driving home to inform him that Matsuo did not want him back because he had been "yelling aggressively at an employee."[1] Employee testified he then informed Ms. Estep of the accident that had occurred earlier that day involving his left knee, and Ms. Estep advised him to come to the office the following morning to complete paperwork related to the accident.

The next day, Employee reported to Employer's office. An accident report was completed indicating, in part, that Employee would seek "outside medical treatment" for his left knee condition. Employee was offered a panel of medical providers from which he selected Fast Pace Urgent Care ("Fast Pace") and, after several discussions with another Employer representative, Kourtni Bybee, he reported immediately to that clinic with complaints of pain and swelling in his left knee. During the examination, he advised the provider of similar left knee issues in the past. According to the August 22, 2023 Fast Pace report, the physician's assistant noted abnormal gait as well as tenderness and swelling in the left knee. Dr. Lytle Brown ordered injections of pain medication, provided a knee immobilizer, and told Employee to report back in seven days.

With respect to his employment status, Employee acknowledged that he understood he was "fired" by Matsuo, but he believed Employer would continue to work with him to obtain another work assignment. However, Ms. Estep testified by sworn statement that she advised Employee on the afternoon of August 21 he had been terminated by Employer.[2] She then asserted that Employee "continued coming back to the facility on approximately four separate occasions," that he was "very confrontational" on those occasions, and that after Employee refused to leave when asked, "[i]t got to the point where we needed to lock our offices." On the fifth such occasion, the police were

---

[1] Employee contended the worker with whom he had the confrontation was related to the "head of human resources" at Matsuo.

[2] On August 22, Employer completed a Separation Notice indicating Employee had been terminated for "aggressive behavior and offensive language."

called to escort Employee off the property. On September 14, 2023, Employer's insurer filed a notice of denial on which it asserted that there was "no injury in the course and scope of employment" and that Employee had provided notice of the alleged accident after he had been terminated.

During the course of discovery, several disputes arose. At the expedited hearing, over the objection of Employer's counsel, Employee alleged he had been advised by someone working for the Bureau of Workers' Compensation that he need not list prior medical treatment for his left knee in his responses to Employer's interrogatories. For example, in response to an interrogatory asking about any prior MRIs, CT scans, or x-rays of the left knee for the three-year period prior to the alleged work accident, Employee wrote "N/A." Employer then produced evidence of both an MRI and a CT scan of the left knee in October 2022 at Jefferson Memorial Hospital, which Employee acknowledged had occurred. Employee had also undergone multiple left knee x-rays, including some as recently as March 2023.

In addition, other than a fractured left patella in 1997, Employee did not disclose in his interrogatory responses any other prior left knee injuries. According to Employer, however, Employee failed to report prior incidents involving his left knee while working for a previous employer, 84 Lumber Company ("84 Lumber"). Settlement documents produced by Employer revealed that Employee reported a left knee injury in October 2022 while exiting a forklift at 84 Lumber. Then, on February 21, 2023, after 84 Lumber terminated him for cause, he reported tripping over something the previous day and re-injuring his left knee. When asked about these prior incidents during the expedited hearing, Employee replied, "There was [sic] no injuries. I got hurt on the job and my leg swelled up. There was some excess fluid buildup on [sic] my leg. There was no significant injury." He later stated during cross examination that "getting hurt and having an injury are two different things to me."

During the expedited hearing, Employer presented the testimony of Ms. Bybee, its human resources and recruiting manager. Ms. Bybee testified that she was familiar with the workstations at Matsuo and the floor mats used at that facility. She estimated that the floor mat at the spring inspector station was "maybe like an inch, inch and a half [high]."[3] Ms. Bybee recounted that, on the afternoon of August 21, 2023, her office had received a call from Matsuo stating they were requesting that Employee be terminated due to "offensive and aggressive behavior." She also described a "heated conversation" she had with Employee the morning after the alleged accident. Moreover, Ms. Bybee stated that, had Employee not been terminated for cause, Employer would have offered him

---

[3] During closing arguments, Employee asserted that although he had been told he would work as a spring inspector, Matsuo placed him at a station inspecting circuit boards. He called into question Ms. Bybee's testimony regarding her understanding of the floor mats used at the spring inspector stations because he did not work at a spring inspector station.

accommodated work if his treating physician had placed restrictions on his work activities.

Following the expedited hearing, the trial court determined Employee had failed to come forward with sufficient evidence indicating he is likely to prevail at trial in proving the occurrence of a compensable left knee injury. The trial court noted inconsistencies in Employee's testimony, which the court concluded was not credible, countervailing evidence from Employer, and Employee's prior history of work-related accidents and medical treatment for his left knee. Employee has appealed.

**Standard of Review**

The standard we apply in reviewing the trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2023). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Moreover, the interpretation and application of statutes and regulations are questions of law that are reviewed de novo with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2023).

**Analysis**

On his notice of appeal, Employee asserts the trial court erred in failing to consider medical records documenting his injury. Employee alleged that he was unable to introduce certain medical evidence supporting his claim and that the trial court erred in considering whether the alleged work accident was witnessed by anyone else, stating that "[n]o witness is needed to prove [an] injury." Finally, Employee noted several factual disputes he claimed the court erred in resolving against him. In his "Motion for Appeal," which we are treating as his brief, Employee identified two issues for our consideration, which we have restated as follows: (1) whether the trial court erred in resolving certain factual disputes and in assessing Employee's credibility; and (2) whether the trial court failed to consider all relevant medical evidence supporting his claim.

4

*Factual Determinations and Credibility*

It is well settled that an employee has the burden of proving every essential element of his or her claim. *Scott v. Integrity Staffing Solutions*, No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). At an expedited hearing, however, an employee need not prove every element of his or her claim by a preponderance of the evidence in order to obtain relief. *Id.* Instead, at an expedited hearing, the employee has the burden of coming forward with sufficient evidence from which the trial court can determine that the employee is likely to prevail at a hearing on the merits. *Id.* As noted above, with respect to issues hinging on the credibility of witnesses, an appellate court is to give deference to the findings of the trial court. *Sirkin v. Trans Carriers, Inc.*, No. 2015-08-0292, 2016 TN Wrk. Comp. App. Bd. LEXIS 22, at *8-9 (Tenn. Workers' Comp. App. Bd. May 9, 2016).

Here, the trial court noted several discrepancies and inconsistences in Employee's testimony that, in the court's opinion, rendered that testimony not credible. These included the discrepancy in the height of the mat that Employee testified caused him to trip and his explanation for failing to include relevant and complete information in his discovery responses. Given that the trial court had the opportunity to hear Employee testify live and observe his demeanor, we cannot conclude the trial court erred in its assessment of Employee's credibility as to these factual issues.

*Court's Consideration of Medical Evidence*

Next, Employee asserts the trial court failed to consider all relevant medical evidence supporting his contention that a work-related injury occurred. In particular, Employee claims the trial court did not consider medical reports dated August 22, August 29, and September 29. Yet, medical records from Fast Pace with those dates were admitted into evidence as part of Exhibit 7 and were considered by the trial court. Thus, the question is not whether the court failed to consider the medical evidence in question, but whether that evidence preponderates against the trial court's determination that Employee is not likely to prove the occurrence of a compensable accident at trial.

The August 22 Fast Pace record reflects that Employee reported pain "of the anterior aspect of the left knee." This record also notes that Employee reported a work injury occurring on August 21 "which had a gradual onset." X-rays revealed no fractures "or other acute abnormalities," no significant joint effusion, and no loose bodies. However, during the physical examination, the physician's assistant noted altered gait, tenderness, and "left knee effusion evident by observation." Employee was diagnosed with a left knee sprain and "unilateral primary osteoarthritis" in the left knee. At Dr. Brown's instruction, the physician's assistant injected Employee's knee and provided a knee immobilizer, advising Employee to return for a follow-up examination the following week.

One week later, on August 29, the physician's assistant indicated he believed the patient "likely suffered a meniscus tear of his left knee." He recommended that Employee continue to be restricted to "sit down work only" and wear the knee immobilizer. He also recommended an MRI "for further evaluation of the meniscus injury." On September 29, Employee returned to Fast Pace complaining of ongoing "moderate" pain and swelling in his left knee. Employee had not been authorized to undergo an MRI, and the physician's assistant reiterated his request for that diagnostic test so that he could "make further treatment recommendation[s]."

Employer issued its notice of denial on September 14 and declined to authorize any further medical treatment after the September 29 visit. Thus, Employer did not authorize an MRI or other diagnostic testing to confirm a possible meniscal tear.

Based on our review of the totality of the evidence presented to date, and in particular the Fast Pace medical reports, we conclude the evidence preponderates against the trial court's denial of medical benefits. The August 22, 2023 Fast Pace report documented objective evidence of altered gait, tenderness, and left knee effusion. Employee was given injections and a knee immobilizer, all within 24 hours of the alleged incident. At the following visit, the provider noted his suspicion of a meniscal tear and recommended an MRI, but Employer declined to authorize this diagnostic test or any additional treatment. Thus, regardless of Employee's credibility issues, the objective medical evidence supports a finding that some event close in time to the August 22, 2023 office visit caused new or sudden increased symptoms in Employee's left knee.

Moreover, Employer admits that Employee reported the accident on the date of its occurrence, appeared at Employer's office the following morning to complete an accident report, and requested medical care. Employer provided a panel and authorized Employee to seek medical care at Fast Pace. As of the date of the denial, Employer asserted: (1) there was no injury in the course and scope of employment; and (2) Employee reported the incident after he had been terminated. However, as noted above, the medical evidence supports a finding that *some event* caused his knee to swell on or about August 21, 2023, and it is undisputed that Employee reported the work accident on the date of its occurrence.

At the hearing, Employer also relied on evidence of prior left knee complaints to suggest that his current symptoms are not related to an August 2023 work accident. Yet, when Employee was treated for left knee symptoms in late 2022, the physician noted Employee's left knee swelling had resolved. An October 5, 2022 CT of the left knee revealed "no acute or significant bony abnormality." The MRI completed on October 19, 2022 showed no confirmed tendon tears.[4] Thereafter, a November 16, 2022 medical

---

[4] The radiologist reading the MRI noted, however, that there was a "single image raising the possibility of a tiny undersurface longitudinal tear" of the posterior horn medial meniscus.

report reflected "no joint effusion" and indicated Employee was "currently asymptomatic." Moreover, when Employee reported to Jefferson Memorial Hospital in March 2023, the physician noted "no joint effusion." X-rays revealed evidence of tricompartmental degenerative changes, but no acute fracture and "[n]o knee effusion." There was also no suggestion of a meniscal tear in those records. Thus, for at least five months prior to the alleged work accident in August 2023, there is no evidence Employee experienced left knee swelling or evidence of a meniscal tear.

In sum, at this interlocutory stage of the case, we conclude there is sufficient evidence in the record to support a finding that Employee is likely to prevail in proving the occurrence of a work-related event that caused left knee symptoms and in establishing his entitlement to certain additional medical benefits, including a diagnostic MRI of his left knee. This does not, however, relieve Employee of his ultimate burden to prove by a preponderance of the evidence that his current left knee condition arose primarily from the alleged work accident.

*Claim for Temporary Total Disability*

We also conclude that the trial court did not err in denying Employee's interlocutory claim for temporary disability benefits. An injured worker is eligible for temporary disability benefits if: (1) the worker became disabled from working due to a compensable injury; (2) there is a causal connection between the injury and the inability to work; and (3) the worker established the duration of the period of disability. *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978). Entitlement to temporary total disability benefits ends either by the ability to return to work or the attainment of maximum recovery. *Id.* However, a termination due to the violation of a workplace rule may relieve an employer of its obligation to pay temporary partial disability benefits, provided the termination was related to the workplace violation. *Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at \*8 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015). An employer will not be penalized for enforcement of a workplace policy if the court determines "(1) that the actions allegedly precipitating the employee's dismissal qualified as misconduct under established or ordinary workplace rules and/or expectations; and (2) that those actions were, as a factual matter, the true motivation for the dismissal." *Durham v. Cracker Barrel Old Country Store, Inc.*, No. E2008-00708-WC-R3-WC, 2009 Tenn. LEXIS 3, at \*9 (Tenn. Workers' Comp. Panel Jan. 5, 2009).

In the present case, Employee admitted there was some disagreement with a Matsuo employee as he was preparing to clock out on the date of the incident. He acknowledged that Matsuo contacted Employer that day to advise Employer they no longer wanted him working at their facility. Further, Employee admitted that he was advised of this fact by Ms. Estep. Finally, Ms. Bybee testified without contradiction that it was Employer's policy to accommodate work restrictions. Thus, although there is

7

medical evidence indicating that Employee was restricted to "sit down only" work after the August 21, 2023 incident, Employer offered credible testimony that Employee was terminated for cause and that, but for his termination, Employer would have accommodated his light duty restrictions. As a result, we affirm the trial court's denial of Employee's interlocutory request for temporary disability benefits.

## Conclusion

For the foregoing reasons, we affirm the trial court's denial of temporary disability benefits, but we reverse the trial court's denial of additional medical benefits and remand the case. Costs on appeal are taxed to Employer.



| Jonathan Webb | ) | Docket No. 2023-02-7158 |
| | ) | |
| v. | ) | State File No. 68594-2023 |
| | ) | |
| Gem Care, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Brian K. Addington, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 26th day of April, 2024.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|------|------|------|------|------|------|
| Jonathan Webb | | | | X | webbj1308@gmail.com |
| Allen Callison | | | | X | allen.callison@mgclaw.com |
| Brian K. Addington, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov